# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

**FILED**

Aug 26, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ROBERT SALAZAR, aka | ) | Case No. **1:25-MJ-00092-BAM** |
| "Bobby Salazar" | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT BY RELIABLE ELECTRONIC OR TELEPHONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 2, 2024___ in the county of ___Fresno___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 844(i) | Arson of Commercial Property<br>Minimum of 5 years and a maximum of 20 years incarceration<br>$250,000 fine, 3 years supervised release, $100 penalty assessment |
| 18 USC 844(h)(1) | Arson in Furtherance of a Federal Felony<br>10 years' incarceration mandatorily consecutive to any other sentence<br>$250,000 fine, 3 years supervised release, $100 penalty assessment |

This criminal complaint is based on these facts:

See attached affidavit of SA Kristin Loeffler.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Kristin Loeffler, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P.
4.1 by telephone

_____
*Judge's signature*

Date: ___08/23/2025___

City and state: ___Fresno, CA___          Hon. Barbara A. McAuliffe, U.S. Magistrate Judge
*Printed name and title*

1
2
3
4
5

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

6   UNITED STATES OF AMERICA,                    CASE NO.

7                           Plaintiff,           AFFIDAVIT OF SPECIAL AGENT KRISTIN E.
                                                 LOEFFLER
8                    v.

9   ROBERT SALAZAR
10  aka "Bobby Salazar"

11                          Defendant.

12

13

14                          I.    **INTRODUCTION**

15      1.      This Affidavit is in support of an arrest warrant for Robert **SALAZAR** (hereinafter

16  referred to as **SALAZAR**) and for violations of:

17              a.   18 U.S.C. § 844(i), Arson of Commercial Property, in that **SALAZAR**

18                   maliciously damaged or destroyed by means of fire a building used in interstate

19                   commerce or in an activity affecting interstate commerce; and

20              b.   18 U.S.C. § 844(h)(1), Arson in Furtherance of a Federal Felony, in that

21                   **SALAZAR** used fire to commit any felony which may be prosecuted in a court of

22                   the United States, including mail fraud, wire fraud, conspiracy to commit mail or

23                   wire fraud, and conspiracy to commit a crime against the United States within the

24                   meaning 18 U.S.C. §§ 1341, 1343, 1349, and 371.

25      2.      The information contained in this Affidavit is based upon my personal observations and

26  training and, where noted, information related to me by other law enforcement officers and/or agents.

27      3.      As stated further in this Affidavit, law enforcement officers have gathered evidence to

28  support probable cause that **SALAZAR** commit arson by directing others to burn down one of his

restaurant properties so that **SALAZAR** could collect on a $908,050 insurance policy.

## II.    AFFIANT'S BACKGROUND

4.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and have been so employed since May of 2020.  I am currently assigned to the ATF Reno, Satellite Office, in Reno, NV and was previously assigned to the ATF Fresno Field Office in Fresno, CA, specializing in investigations involving the illegal possession of firearms and other federal offenses involving firearms, arson, and explosives.  I have assisted in approximately 30 controlled purchases of firearms and narcotics and authored and assisted in numerous search and arrest warrant operations. In 2020 I completed the Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia.  In 2021 I completed Special Agent Basic Training (SABT) at the ATF National Academy, at FLETC. During my time at FLETC I received training in a variety of investigative techniques, legal matters pertaining to firearms, arson, and explosives, the drafting of search warrant affidavits and probable cause. Prior to my employment with ATF, I spent five years in the Army as a Military Policeman from 2003-2008.  While in the U.S., I oversaw soldiers initiating investigative measures; identified, pursued, and arrested suspects and perpetrators of criminal acts; identified, collected, and preserved evidence; conducted subject interviews; and prepared reports.

5.       Between my time in the military and my employment with ATF I have held employment with the U.S. Department of State as a Security Protective Specialist as well as an Independent Contractor with the Department of Defense as a firearms instructor. Both occupations required knowledge of, and proficiency with, firearms. I hold a Bachelor of Science in Global Security and Intelligence Studies from Embry Riddle Aeronautical University.

## III.    SUMMARY OF PROBABLE CAUSE

6.      On April 2, 2024, Bobby Salazar's Taqueria at 2389 N. Blackstone was set on fire by CO-CONSPIRATORS 1 and 2. **SALAZAR**, the owner of the building, hired CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 to commit arson so that **SALAZAR** could collect on the $908,050 insurance policy on the building as well as policies on personal property and loss of rent.

## IV.    STATEMENT OF PROBABLE CAUSE

### A.    Background on Robert "Bobby" Salazar and the "Bobby Salazar's" Restaurants

7.    **Robert "Bobby" Salazar** (hereinafter "**SALAZAR**") operates a chain of restaurants in the Fresno, California, area, in the Eastern District of California, named "Bobby Salazar's Taqueria" or "Bobby Salazar's Mexican Restaurant and Cantina." According to statements made by **SALAZAR**, he owns and operates some of the restaurants himself and leases other restaurant locations to franchisees. According to his website, **SALAZAR** also sells salsa in retail stores in California, Oregon, Nevada, Hawaii, Washington, Montana, Idaho, Utah, and Texas.

8.    Up until January 31, 2024, one of the restaurant franchise locations for a Bobby Salazar's Taqueria was located at 2839 N Blackstone Ave., Fresno, CA. In an Examination Under Oath (EOU) with representatives from The Hartford Insurance Company, an insurance company based out of Connecticut, **SALAZAR** confirmed that he had owned the restaurant located at 2839 N Blackstone Ave. for over 20 years, first as an individual, then through the Salazar/Ruiz Family Trust. **SALAZAR** and his wife, are the only two trustees based upon loan documents, bank records, and **SALAZAR**'s statements during the Examination Under Oath. The Examination Under Oath was regarding a claim filed concerning a fire that occurred on April 2, 2024, at 2839 N Blackston Ave., at **SALAZAR**'s restaurant, discussed further below.

9.    According to statements made by **SALAZAR** and records provided to The Hartford by an employee, the restaurant located at 2839 N Blackstone Ave was last operated by a franchisee. **SALAZAR** indicated that the franchisee had leased the property and that the lease ended at the end of January 2024. In a letter written to **SALAZAR** on or about August 16, 2023, the franchisee gave **SALAZAR** notice that he would no longer be operating the restaurant as of January 31, 2024, due to a request by **SALAZAR** to stop doing business under the name "Bobby Salazar's Mexican Restaurant and Cantina." The franchisee stated that he would not be able to change the name and therefore had to terminate the lease. At that time, the 2839 N Blackstone Ave restaurant location was closed to the public. **SALAZAR** told The Hartford that he then used the location as a storage facility for restaurant equipment. When the franchisee vacated the property, **SALAZAR** claimed he did a walkthrough of the

property when the lease was up at the end of January, with the franchisee and his maintenance man. **SALAZAR** indicated this walk through lasted only fifteen minutes.  **SALAZAR** claimed to not do any cleaning or repairs after the franchisee vacated the property.  **SALAZAR** claimed he started to use property as a storage space after the franchisee vacated.  **SALZAR** indicated he began doing this a couple of weeks into February.  **SALAZAR** indicated he stored "…restaurant equipment.  Odds and ends."

### B.    SALAZAR Renews Insurance Policy on 2839 N Blackstone Ave. Restaurant Location

10.    Based on a review of insurance policy records provided by The Hartford, in February 2024, **SALAZAR's** insurance policy on the restaurant located at 2839 N Blackstone Ave was renewed. The policy was issued by The Hartford Underwriters Insurance Company, which is a member of the Hartford Insurance Group, and it was brokered by Kraft Lake Insurance Agency Incorporated. The new policy covered the restaurant building located at 2839 N Blackstone Ave. for $908,050 and business and personal property for $229,900. The renewed policy increased coverage by approximately $102,000 from the previous year's policy. The policy also covered $50,000 in loss of rent. **SALAZAR** renewed the insurance policy after the restaurant closed in January 2024.

### C.    The Bobby Salazar's Restaurant at 2839 N Blackstone Ave. Burns Down

11.    On April 2, 2024, at approximately 2:14 a.m., Fresno Fire Department (FFD) Communications received a 911 call reporting a fire at 2839 N Blackstone Ave., the location of **SALAZAR**'s closed restaurant discussed above.  Upon arrival, fire suppression crews found that the front door of the restaurant, on the east side of the building, and the rear door, on the west side of the building, were open.  The fire suppression crew determined there were three separate fires burning on the interior of the structure.

12.    After the fire was extinguished, a fire origin and cause investigation was conducted.  An ignitable liquid detection K9, trained to detect ignitable liquids such as gasoline, sniffed the scene and alerted within the fire debris to multiple fire origins.  Investigators located two partially burned gas cans in the kitchen of the restaurant.  At the conclusion of the investigation, due to multiple origins, ignitable liquid pour patterns, and surveillance video showing two suspects lighting the fire, the cause of the fire

was determined to be arson.

 

Partially burned gas cans

 

Fire damage inside the restaurant

13.    An FFD investigator later went back to the scene to canvass for surveillance video. The FFD investigator obtained and viewed video footage from a residence in the area near 2839 N Blackstone Ave. From the footage, the investigator observed that, on April 1, 2024, at approximately 11:53 p.m., a black SUV, which appeared to be a Chevy Suburban or a GMC Yukon style-vehicle, drove by the property at 2839 N Blackstone Ave slowly and then turned into the alley behind the restaurant

and drove south. The same SUV drove by again at approximately 11:57 p.m. and drove slowly through the front parking lot of the restaurant at 2839 N Blackstone Ave.

14. The black SUV drove by again at 12:16 a.m., on April 2, 2024, and parked on a street directly north of the restaurant. At that time two subjects exited the black SUV and walked around the property at 2839 N Blackstone Ave. The driver appeared to be a medium build adult male, and the passenger appeared to be a medium to large build adult female with long hair in a ponytail. The female subject appeared to be carrying a phone in her hand. The two subjects walked in front of the restaurant, out of view of the camera, and did not return into view until they walked around the back side of the restaurant, through the alley, at approximately 12:38 a.m. After walking completely around the building, they got back into the SUV and drove back down the alley.

15. At approximately 1:07 a.m., the SUV returned, driving north up the alley and parking next to the back door of the restaurant at 2839 N Blackstone Ave. The passenger exited the vehicle and set items, later identified as two gas cans, next to the rear door. The SUV then parked on the north side of the structure, on the street directly to the north of the restaurant. The same two subjects then exited the vehicle and walked towards the front door of the restaurant, on the east side of the building. At approximately 2:04 a.m., the back door of the restaurant opened from the inside. The male subject walked out the back door and picked up the two gas cans, then went back inside the restaurant. At approximately 2:08 a.m., the back door opened again. The female exited first, and the male stopped in the entryway, leaned down, and ignited a fire. A large flash of light occurred, and flames instantly became visible. The two subjects returned to the SUV and left southbound on Blackstone Ave.

16. The surveillance camera captured a clear view of the alley. The black SUV drove through the property at 2839 N Blackstone Ave and the alley multiple times between 11:53 p.m. on April 1, 2024, and 2:08 a.m. on April 2, 2024. No other vehicles or people were visible in the alley or near the property at 2839 N Blackstone during that time frame.

**D.    Investigators Identify the Subjects that Set the Fire**

17. On April 4, 2024, FFD authored a state GeoFence search warrant to identify one or both

of the involved suspects.[1] With the Geofence data it was found that one of the suspects in the black SUV was CO-CONSPIRATOR 2, identified through subscriber information. CO-CONSPIRATOR 2's physical characteristics appeared to be the same as the suspect in the surveillance video. CO-CONSPIRATOR 2 also can be seen in body camera video from past contacts with law enforcement and appeared to have the same body shape and size as the subject in the surveillance video, as well as long dark hair kept in a ponytail. Surveillance of CO-CONSPIRATOR 2 also showed her appearance to be consistent with the female suspect in the surveillance video of the fire at 2839 N Blackstone Ave.

18.     On May 1, 2024, at 7:00 a.m., a state search warrant was served at CO-CONSPIRATOR 2's residence in Fresno, CA. The surveillance video, which captures the arson fire, shows CO-CONSPIRATOR 2 wearing black Vans shoes with a white Vans emblem and red shoelaces. Those shoes were found inside CO-CONSPIRATOR 2's bedroom during the search warrant. CO-CONSPIRATOR 2's cell phone, with a red case and a picture of a woman posing as the devil on the back of the case, was also found in her bedroom.

19.     CO-CONSPIRATOR 2 was interviewed by law enforcement and admitted to being involved in the fire incident but denied being the one who set the fire. CO-CONSPIRATOR 2 stated that **Bobby SALAZAR** paid someone she knows to set the fire. CO-CONSPIRATOR 2 was advised that the surveillance clearly shows that she was involved in the fire. CO-CONSPIRATOR 2 admitted to going to the location knowing they were going to break into the restaurant and set it on fire but denied being the one who set the fire[2]. CO-CONSPIRATOR 2 confirmed that the cell phone on her bed, with the red case and woman posing as the devil, was her cell phone. CO-CONSPIRATOR 2 was asked if she could provide the passcode for the phone which she did. When asked if the Vans shoes with the red shoelaces were hers also, she agreed that they were.

20.     A search of CO-CONSPIRATOR 2's phone, pursuant to a state search warrant, revealed

---

[1] A GeoFence warrant allows law enforcement to obtain location data from companies about the devices that were present within a specific geographic area during a certain period of time.

[2] During her interview, CO-CONSPIRATOR 2 identified a different person than CO-CONSPIRATOR 1 as the person with her the night of the fire. The person she identified was in Fresno County Jail custody at the time of the fire. CO-CONSPIRATOR 2 has a recent criminal history including burglary and other crimes involving moral turpitude.

text messages with a person later identified as CO-CONSPIRATOR 1. On April 2, 2024, starting at 2:20 a.m., CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 exchanged text messages discussing the fire and information that CO-CONSPIRATOR 2 appeared to be hearing via a scanner, possibly on an application on her phone:

CO-CONSPIRATOR 1: "Fire was still going bunch of fire trucks".

CO-CONSPIRATOR 2: "Yeah I heard it now" "yeah they're saying it's on fire".

CO-CONSPIRATOR 1: "Still shit they had to have seven or eight fire truck there".

CO-CONSPIRATOR 2: "Idk there still saying it's on fire I wonder if propane blew" "It's in the attic".

CO-CONSPIRATOR 1: "I seen that guy in the tie dye shirt standing over down by the Denny's with a

bunch of like homeless looking people looking at the fire" "Yeah I hope those Cameras don't work".

CO-CONSPIRATOR 2: "They haven't said anything about witnesses or or f**** anything"

CO-CONSPIRATOR 2: "Fires out not sure of the damage".

21.    Later, on April 2, 2024, at 10:05 a.m., CO-CONSPIRATOR 1 texted CO-CONSPIRATOR 2, "Building doesn't look to bad on outside" and at 12:07 p.m., "Headed to Bobby's wya". At 12:05 p.m., call detail records show that CO-CONSPIRATOR 1 had called Bobby Salazar's Taqueria at 497-9921. The call lasted approximately one minute and eight seconds.

22.    On April 5, 2024, CO-CONSPIRATOR 2 texted CO-CONSPIRATOR 1, "Yeah you got paid all that money from bobby fucking to do what." On April 6, 2024, she said, "yeah now u can spend the money from bobbie on ur bitch….even though I took penitentiary chances for ur stupid ass." Investigators believe CO-CONSPIRATOR 2 was referring to her previous criminal record and knew that if she was arrested for the arson, she would be facing a third strike.

23.    On April 7, 2024, CO-CONSPIRATOR 2 texted CO-CONSPIRATOR 1 at 10:38 a.m., "since he's supposed to pay u tomorrow do u have 10$ on cash app i have no ciggerettes." And then later at 3:48 p.m., "…even though we're getting money from Bobby tomorrow…keep the f*****

money…I don't need s*** from you."

24.    On April 8 and 9, 2024, CO-CONSPIRATOR 1 exchanged messages with CO-CONSPIRATOR 2 stating he was "headed to bobby's. I called and they said he wasn't there but going by there anyways" and later, "he here." On April 9, CO-CONSPIRATOR 1 said CO-CONSPIRATOR 1 was at Bobby's to "straighten stuff out with him" then sent CO-CONSPIRATOR 2 a photo of a Bobby Salazar's catering truck. CO-CONSPIRATOR 2 then asks "so did he finish paying," to which CO-CONSPIRATOR 1 replied, "not until Monday…no had to talk to him about this money he owes. Got it straighten out now want me to come by and tell u about it or no?"

25.    On April 15, 2024, CO-CONSPIRATOR 2 texted CO-CONSPIRATOR 1, "just pay me and leave me alone fuck u punk." CO-CONSPIRATOR 1 later replied, "just don't spend it. Put it up so it not in ur pocket or on u and forget about it."

26.    On April 21, 2024, CO-CONSPIRATOR 1 told CO-CONSPIRATOR 2 that he "didn't just line up pockets with $2500 that I didn't have to cut u in on," to which CO-CONSPIRATOR 2 replied, "you didn't have to cut me in on" and again told him that she took penitentiary chances for him.

**E.    CO-CONSPIRATOR 1 Tells Others to Visit SALAZAR and Tell Him the "Feds are Looking into Him"**

27.    On May 1, 2024, after her arrest and booking into FCJ, CO-CONSPIRATOR 2 called CO-CONSPIRATOR 1 from a jail phone. CO-CONSPIRATOR 1's phone was identified based on a review of subscriber records and recovered cell phone data. In the jail calls, CO-CONSPIRATOR 2 told CO-CONSPIRATOR 1, "they have everything." She explained to him that investigators were asking her if she knew Bobby and that investigators had video footage of "everything, down to what I was wearing, what you were wearing, your bitch's car. Everything." CO-CONSPIRATOR 1 told CO-CONSPIRATOR 2, "they can't prove you lit shit" and asked her if she had admitted to anything. I know the voices to belong to CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 from numerous phone calls between them throughout the investigation.

28.    State gang investigators recognized CO-CONSPIRATOR 1 as the president of the Screamin Demons Motorcycle Club (SDMC). Investigators sought and received a state arrest warrant for CO-CONSPIRATOR 1 and state search warrants for his residence and his clubhouse. The warrants

were served on May 2, 2024. CO-CONSPIRATOR 1 was arrested and booked into the Fresno County Jail that day. During an interview with fire investigators, CO-CONSPIRATOR 1 said he had dropped his phone the day prior and that it no longer functioned. When asked where it was, he stated that it was somewhere in his bedroom. CO-CONSPIRATOR 1 denied any knowledge of, or participation in, the fire. CO-CONSPIRATOR 1 then ended the interview.

29.     While in FCJ, CO-CONSPIRATOR 1 made several phone calls to his wife as well as to the Seargeant-at-Arms for the Screamin' Demons Motorcycle Club.

30.     During those calls, CO-CONSPIRATOR 1 discussed **SALAZAR** sponsoring an upcoming motorcycle club activity, the Shovelhead Run.  Later, while reviewing a subpoena return related to CO-CONSPIRATOR 1's Google account information, investigators found a photo of a piece of lined paper with "Shovelhead Sponsor List" handwritten at the top. One of the sponsors listed was "Bobby Salazar."

31.     Later, after CO-CONSPIRATOR 1 was charged in an unrelated federal case, he began to talk to his wife and the Sergeant-at-Arms about how he believed that **SALAZAR** was a target of a federal investigation connected to the arson.

32.     Starting in late June, CO-CONSPIRATOR 1 began to send the Sergeant-at-Arms to go meet with **SALAZAR**.  In a series of conversations, CO-CONSPIRATOR 1, his wife, and the Sergeant-at-Arms discussed the need to meet with **SALAZAR** so that **SALAZAR** could provide CO-CONSPIRATOR 1 with money for a lawyer.

33.     For example, on June 24, 2024, at 3:54 p.m., CO-CONSPIRATOR 1 called his wife and told her, "I'm not gonna snitch on no one. Of course that's gonna cost him," and "Like he's gonna put the money up for it, or, or he can come to jail with me."  CO-CONSPIRATOR 1 and his wife then made a plan for the Sergeant-at-Arms to visit **SALAZAR**.

34.     On June 25, 2024, during a recorded visit with his wife, CO-CONSPIRATOR 1 discussed how the Sergeant-at-Arms had visited **SALAZAR** at his restaurant on CO-CONSPIRATOR 1's behalf.

35.     CO-CONSPIRATOR 1 had further conversations about the Sergeant-at-Arms meeting

**SALAZAR** on CO-CONSPIRATOR 1's behalf throughout June and July on at least 14 separate occasions.

36.    During these conversations CO-CONSPIRATOR 1 repeatedly referenced his continued conspiracy with **SALAZAR** to conceal the arson.

37.    For example, on June 30, 2024, CO-CONSPIRATOR 1 told the Sergeant-at-Arms in a recorded jail call, "unless, ya know, he wants to be in here next to me ya know he needs to figure something out."

38.    One July 19, 2024, CO-CONSPIRATOR 1 told the Sergeant-at-Arms, "Make sure you tell him my lawyer said the feds are building a case against him," and "Right but he needs to know that they are, the feds are looking into him big time." During that conversation, the Sergeant-at-Arms told CO-CONSPIRATOR 1 that he would try to meet **SALAZAR** on Monday around noon.

39.    On Monday July 22, 2024, investigators conducted surveillance at Bobby Salazar's Restaurant, owned by **SALAZAR**, at 725 E Olive Ave, in Fresno, CA. At approximately 12:14 p.m., a gray GMC Canyon pulled into the back parking lot of the restaurant. The driver appeared to be the SDMC Sergeant-at-Arms based on his driver's license photo as well as photos from CO-CONSPIRATOR 1's phone. Additionally, the GMC Canyon was registered to another SDMC member, and in recorded conversations CO-CONSPIRATOR 1 discussed with the Sergeant-at-Arms that the Sergeant-at-Arms was using that vehicle.

40.    During surveillance, investigators observed the driver of the truck walk to the back door of the restaurant. He was then observed sitting in the vehicle with the door open as if he was waiting for something or someone. The driver never reentered the restaurant and left at approximately 12:16 p.m.

41.    Later, on July 22, 2024, CO-CONSPIRATOR 1 made a phone call to his wife, where his wife told him that the Sergeant-at-Arms had gone to **SALAZAR**'s restaurant, but **SALAZAR** wasn't there. The wife told CO-CONSPIRATOR 1 that the Sergeant-at-Arms would try again.

42.    On July 25, 2024, CO-CONSPIRATOR 1 called his wife and discussed how the Sergeant-at-Arms was still trying to meet **SALAZAR**, and that he was going to return the next day, June 26, 2024, to meet with **SALAZAR**.

43.     On July 26, 2024, investigators again conducted surveillance at the restaurant. At approximately 10:00 a.m., the same Gray GMC truck investigators had previously observed parked on the southeast corner of N Linden Ave. and Olive Ave. The vehicle was occupied by two subjects. The driver was positively identified as the Sergeant-at-Arms, and the front passenger was an unidentified heavy-set white male (UM).

44.     The UM exited the vehicle at approximately 10:15 a.m. The Sergeant-at-Arms remained in the driver's seat. After approximately 20 minutes of pacing in front of the restaurant, the UM walked into the front door of the Bobby Salazar's Taqueria.  Approximately 10 minutes later, an investigator also entered the restaurant where they observed the UM by the bar area and then observed the Sergeant-at-Arms standing in the back of the restaurant near the bathrooms and rear parking lot entrance, appearing to have entered through the back entrance.

45.     The investigator then observed **SALAZAR**, the Sergeant-at-Arms, and the UM walk out of the rear exit that goes to the back parking lot. During this time there were no other customers in the restaurant. The only non-employees in the restaurant were the UM, the Sergeant-at-Arms, and the investigator. Neither the Sergeant-at-Arms nor the UM were holding any type of to-go food, or anything similar, indicating they entered the restaurant for food prior to them walking out the back door with **SALAZAR**.

46.     After several minutes, **SALAZAR** walked back into the restaurant from the back door, alone. The UM and the Sergeant-at-Arms were not seen. **SALAZAR** immediately walked through the restaurant to the front door and stood outside looking up and down Olive Ave. for approximately one minute before going back into the restaurant and walking into the kitchen area.

47.     The Sergeant-at-Arms and the UM were then observed back in the GMC driving westbound on Olive Ave. and turning into the parking lot on the northeast corner of Lucerne and Olive Ave. The truck reversed into the parking stall two stalls from a Chevy Tahoe owned by **SALAZAR**. At approximately 11:50 a.m., the Sergeant-at-Arms and **SALAZAR** were seen walking back into the parking lot, getting into their respective vehicles, then leaving the parking lot. It was unclear where **SALAZAR** and the Sergeant-at-Arms had walked from.

48.     Less than two hours later, CO-CONSPIRATOR 1 made a phone call to his wife, who confirmed that the Sergeant-at-Arms had gone there to try to meet **SALAZAR**.

49.     Based on my training and experience, these cell phone and jail phone conversations are significant because they indicate that **SALAZAR** was a co-conspirator and aider and abettor in their crimes, and also because they show, contrary to **SALAZAR**'s statements to both fire and insurance investigators, that he did know CO-CONSPIRATOR 1. CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 would not discuss being paid by **SALAZAR** if he had not hired them to commit the arson. CO-CONSPIRATOR 1, his wife, and the SDMC sergeant-at-arms, would not discuss visiting **SALAZAR** to discuss the arson if **SALAZAR** was not a co-conspirator, including specifically warning **SALAZAR** that there was a federal investigation into the fire. Additionally, as described throughout this affidavit, surveillance shows agents of CO-CONSPIRATOR 1 meeting with **SALAZAR** at CO-CONSPIRATOR 1's direction to discuss CO-CONSPIRATOR 1 and **SALAZAR**'s shared liability for the arson. Taken collectively, these conversations and observations indicate to me that **SALAZAR** is a co-conspirator who is part of the group responsible for the fire, rather than a victim of the fire.

   **F.     Phone Records Show SALAZAR was Communicating with CO-CONSPIRATOR 1**

50.     On May 10, 2024, a Fresno Fire investigator spoke with **SALAZAR** about the fire and informed him that it was suspected arson. When told who the suspects were, **SALAZAR** denied knowing either CO-CONSPIRATOR 1 or CO-CONSPIRATOR 2, and he denied giving them permission to be on the property. When asked if there was anybody who would have reason to start the fire, **SALAZAR** stated that there was nobody, to his knowledge.

51.     However, phone records show that **SALAZAR** had multiple communications with CO-CONSPIRATOR 1.

52.     In May 2024, FFD investigators served AT&T with a state search warrant for the Call Detail Records (CDRs) for CO-CONSPIRATOR 1's cell phone number for the dates of August 1, 2023, through May 2, 2024. The CDRs showed that CO-CONSPIRATOR 1 received and made voice calls approximately 32 times to phone number (559) 497-9921. The calls lasted between zero and two minutes. He also made and received voice calls to (559) 497-9920 approximately five times. These calls

lasted between zero and one and a half minutes. He received six voice calls from (559) 293-3108. Most phone calls lasted for less than one minute.

53.    A search of law enforcement databases in May 2024 showed the number ending in 9920 belonged to Bobby Salazar's Taqueria, 725 E Olive Ave., Fresno, CA 93728. The number ending in 9921 belonged to a Patrick N. Flood; however, as discussed below, as of July 2024, the number ending 9921 was instead registered to Bobby Salazars Taqueria. The number ending in 3108 belonged to Lucy's Lounge, 733 E Olive Ave., Fresno, CA 93728, a restaurant owned by **SALAZAR's** wife two doors down from his own restaurant.. An open-source internet search also showed that the numbers ending in 9920 and 3108 belonged to Bobby Salazar's Taqueria and Lucy's Lounge respectively.

54.    FFD also served AT&T with a state search warrant for the CDRs for **SALAZAR**'s cell phone number (559) 344-2426, for the dates of August 1, 2023, through May 21, 2024. The CDRs showed that CO-CONSPIRATOR 1's cell phone number, ending in 6779, was called four times from **SALAZAR**'s cell phone. These calls lasted between zero and two minutes.

55.    On July 19, 2024, a return was received from Comcast with subscriber information and CDRs for phone numbers ending in 9920 and 9921. According to Comcast, both phone numbers belonged to "Bobby Salazars Mexican" with a service address of **725 E Olive Ave., Fresno, CA**.

56.    A search of the CDRs from Comcast confirmed the information from CO-CONSPIRATOR 1 and **SALAZAR**'s AT&T CDRs. It also showed that the SDMC Sergeant-at-Arms had called the 9920 number on May 9, 2024, six days after CO-CONSPIRATOR 1 was arrested on May 2, 2024. The call lasted for 2 minutes and 28 seconds.

57.    The CDRs confirmed that CO-CONSPIRATOR 1 had contact with **SALAZAR** multiple times; had contact with **SALAZAR**'s restaurant multiple times; and that CO-CONSPIRATOR 1 was contacted by someone at Lucy's Lounge on multiple occasions. The length of the calls also suggested the method that CO-CONSPIRATOR 1 communicated with **SALAZAR**, as he spoke about in a recorded jail phone call with his wife on May 7, "in fact, the way you gotta get a hold of him is you gotta call the restaurant at lunchtime."

58.     As discussed throughout this affidavit, **SALAZAR** has had multiple contacts with CO-CONSPIRATOR 1. I believe his denial that he knows CO-CONSPIRATOR 1 is evidence of his responsibility for the arson and is an effort to distance himself from the fire to law enforcement.

**G.     An Insurance Claim is Submitted to The Hartford Insurance Company**

59.     According to insurance records and an interview with an insurance adjuster from The Hartford insurance company, the fire at 2839 N Blackstone Ave. was reported to The Hartford insurance company on April 3, 2024, at approximately 12:25 p.m. The report was made by an employee of **SALAZAR**'s per information given by **SALAZAR** in his Examination Under Oath with The Hartford, and her information on the Bobby Salazar business website, by calling the 1-800 number on the policy paperwork to report the fire and start the insurance claim. That phone call went directly to The Hartford in Connecticut. The case was then assigned to an insurance adjuster, who was located in Las Vegas, Nevada.

60.     According to the insurance adjuster, she spoke with both the employee and **SALAZAR** on April 3, 2024, regarding the fire and the insurance claim that had been filed. At the time of her conversation with **SALAZAR**, she was located in Las Vegas, NV, and **SALAZAR** was located in Fresno, CA, and the conversation took place by means of wire, specifically a telephone.

61.     A further review of emails provided by The Hartford showed that the employee was in communication with the insurance adjuster on numerous occasions about the insurance claim using her bobbysalazar.com email, including multiple emails discussing and producing information and documents that had been requested by the insurance company. Some emails and attached documents from The Hartford were addressed to "Mr. Salazar" or "Dear Bobby Salazar." Others were addressed to the employee alone. **SALAZAR** also communicated with the insurance adjuster through his lawyer, Robert Cervantes. It is evident through the emails that Cervantes was speaking for **SALAZAR**, for example when he stated, "I had the opportunity to speak with my client" and "he is requesting," as discussed further below.

62.     On all correspondence, both emails and official letters, to the employee, **SALAZAR**, and Cervantes, the insurance adjuster included the following:

"State law requires we communicate the following to you, "'Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.'"

**H.    SALAZAR's Statements to the Insurance Company's Investigator about the Fire**

63.    On April 23, 2024, an investigator for The Hartford met with **SALAZAR** and his wife at Lucy's Lounge, 733 E Olive Ave, Fresno, CA 93728. According to the transcripts and the investigator's notes, **SALAZAR** said he ran two Bobby Salazar's Mexican Restaurants and leases out the others. **SALAZAR** also has a line of signature salsa which he sells in commercial establishments and supermarkets. **SALAZAR** had seven leased restaurants, including the fire location at 2839 N. Blackstone Avenue in Fresno. The restaurant was leased by a franchisee, who could not maintain its popularity and had decided to close in January 2024. **SALAZAR** said the franchisee stopped serving customers in late February 2024.

64.    **SALAZAR** and his wife both stated that they had gone to bed between 9:00 and 10:00 p.m. on April 1. They had gotten up around 5:30 a.m. on April 2 and left their residence around 5:50 a.m. to go to the gym. Their personal trainer pointed out on the television the news broadcast of the fire. **SALAZAR**'s wife stated that she had talked **SALAZAR** out of responding to the scene, because the fire took place several hours prior to the broadcast. **SALAZAR** stated that he had only spoken to personnel from the Fire Department over the phone and had not spoken to the police or the franchisee about the event. **SALAZAR** denied having anything to do with the fire himself or hiring anyone to set the fire.

65.    The investigator also asked **SALAZAR** about past incidents involving a former employee having accused him of "firebombing" her cars, and he denied being involved in any such activity. He also denied being involved in a Molotov cocktail that was thrown at the law office window of the attorney for that employee.

**I.    The Hartford Paid SALAZAR Based on the Insurance Claim Related to the Fire**

66.    In a letter to FFD investigators dated November 14, 2024, The Hartford stated that they had already made a payment to **SALAZAR** in the amount of $30,378.19, based on the insurance claim

related to the fire at 2839 N Blackstone Ave. By June 11, 2025, in a letter to investigators, responding to a request for information, The Hartford stated that they had already made a total payment in the amount of $980,739.12 to **SALAZAR** based on the insurance claim.

67. Also included in that request for information were emails concerning **SALAZAR**'s claim. In an email dated January 3, 2024, **SALAZAR**'s lawyer, Robert Cervantes, told the insurance adjuster that he "had the opportunity to speak with my client after he has reviewed your offer. He is accepting your proposal. He is requesting that all checks be issued in his name. Further, he is requesting that all checks be mailed directly to his address. However, I would request that this office is cc all correspondence and [sic] copies of any and all checks." The insurance adjuster responded that all checks would be mailed to Cervantes' office.

68. In letters to Cervantes dated March 28 and April 23, 2025, the insurance adjuster stated that on January 3, 2025 a payment of $753,006.58 was sent to Cervantes' office for building damages; on February 10, 2025 a payment of $122,717.84 was sent to Cervantes' office for business and personal property damage; and that as of the date of the letter the loss of rent amount for $60,000 was paid in full.

**J.    SALAZAR Has a History of Arson and Witness Threats**

69. In February of 2020, a lawsuit was filed against **SALAZAR** by Employee 1, a former employee of **SALAZAR**'s. The lawsuit alleged wrongful termination. **SALAZAR** had accused Employee 1 of selling drugs out of the restaurant.  Employee 1 was fired after refusing to sign a statement saying he was selling drugs.  Employee 1 told investigators in a June 2021 interview that **SALAZAR** had asked him multiple times to perjure himself in previous lawsuits against **SALAZAR**, which Employee 1 refused to do. After Employee 1's lawsuit was filed **SALAZAR** came to Employee 1's mother's house and offered him $20,000 not to sue him.  Employee 1 refused.  Employee 1 also stated that he had seen **SALAZAR** driving by his house and had following him to his mom's house on multiple occasions.

70. According to Employee 1's attorney, on March 19, 2020, **SALAZAR** asked another employee, Employee 2, to perjure herself in exchange for money on March 19, 2020. **SALAZAR**

requested that Employee 2 testify about Employee 1's drug use and sales. Employee 2 refused. On April 27, 2020, Employee 1's attorney sent a declaration by Employee 2 to **SALAZAR**'s attorney.

71.    On May 20, 2020, a few days after Employee 1 reported that he refused the $20,000, at 2:30 a.m. Employee 2's car was lit on fire, as shown in the below images. Fire investigators determined this fire was set using poured gasoline.

 

72.    On May 24, 2020, Employee 2 reported seeing someone in her back yard, looking at her through the window.

73.    On July 28, 2020, **SALAZAR**'s ex-brother-in-law's residence was set on fire by a Molotov cocktail[3]. The fire was set shortly after the ex-brother-in-law divorced **SALAZAR's** sister and terminated business dealings with her and **SALAZAR**. During the investigation, the ex-brother-in-law told FFD investigators that he had found another unburned Molotov next to a cracked window, in the bushes next to his house a few days prior to the incident. He also told investigators that **SALAZAR** had driven by his house a few nights prior to the fire. After the fire, the ex-brother-in-law notified investigators that **SALAZAR** had called him stating something like "looks like somebody got you." This second call also occurred immediately after the victim observed **SALAZAR** drive by his house. Photos below show the damage to the ex-brother-in-law's residence:

_____

[3] A Molotov cocktail is a destructive device within the meaning of 18 U.S.C. § 921(a)(4), created by placing gasoline or another flammable liquid inside a frangible container with a wick or fuse. When thrown, it acts as an incendiary device, spreading fire rapidly in an area.



74.    Based on my training and experience, I believe **SALAZAR**'s call was, under the circumstances, a threat to the brother-in-law in the context of their ongoing business dispute as well as a claim of responsibility for the arson. This is corroborated because Molotov cocktails were used in this arson; as shown below, Molotov cocktails were also used in one of the arsons in a series connected to **SALAZAR**'s business dispute with an employee, and **SALAZAR** directly admitted being responsible for some of the arsons in that series.

75.    On August 18, 2020, in the early morning hours, a Molotov cocktail was thrown and the windows of the law office belonging to Employee 1's attorney.

76.    On June 17, 2021, on behalf of another **SALAZAR** employee, Employee 3, the same attorney as represented Employee 1 filed a discrimination lawsuit against **SALAZAR**. **SALAZAR** was served on the afternoon of June 22, 2021. At 1:30 a.m. on the morning of June 23, 2021 all three of Employee 3's cars were burned using poured gasoline, as shown in the photos below:

  

77.     I interviewed Employee 4, who also worked for **SALAZAR** at the time of the above incidents. Employee 4 told me that they were approached by **SALAZAR** and asked to convince Employee 1 to settle the lawsuit for $35,000. About a month later, they were again approached by **SALAZAR** and asked to find someone to testify that Employee 1 sold drugs, and **SALAZAR** would pay for that testimony.

78.     Employee 4 further told me that during a private conversation about the lawsuit from Employee 3, **SALAZAR** told Employee 4 that **SALAZAR** was responsible for the three arson attacks at Employee 3's house. Employee 4 didn't inquire further, including about whether or not **SALAZAR** was responsible for the arsons of Employee 2's vehicle or the attorney's office. Employee 4 indicated to me during our interview that the context of **SALAZAR**'s statement was as a claim to back up **SALAZAR**'s willingness to commit criminal acts.

79.     Taken collectively, these prior arsons involving **SALAZAR** are evidence of his involvement in this case, including the use of fire as a modus operandi and the use of fire to solve business problems. Based on my training and experience, I believe all of these prior fires are linked: the five fires that targeted Employee 2, Employee 3, and attorney office fires share a common purpose, each connected to litigation developments in Employee 1's suit against **SALAZAR**. Because **SALAZAR** admitted being responsible for three of those fires, I believe it is probable he is responsible for all five of those fires, as based on investigation there was no apparent motive besides the business dispute and the only connection between the victims was the business dispute. Additionally, because **SALAZAR** made a statement I understand to be claiming responsibility after the brother-in-law's fire, **SALAZAR** has boasted about being willing to use fire to carry out criminal ends, and the means used in the brother-in-law's fire are the same means as were used in one of the fires in the employee litigation arson series, I believe the totality of the circumstances show that **SALAZAR** is responsible for those fires. I know that arson is a specialized and unusual crime. While there are arsonists who commit single arsons, arson is a crime that commonly occurs in series. In the April 2, 2025 arsons charged in this case, the same methods – poured gasoline – were used as the arson series **SALAZAR** claimed responsibility for, as did the same

general purpose of solving business issues as in both the litigation series and the fire at the brother-in-law's house. Thus, I believe these fires support the conclusion that **SALAZAR** is responsible for the charged offenses.

80.     During an interview with a witness in this case[4] investigators were told that after law enforcement began investigating the fire, the witness observed two men watching his/her house during the night. The next morning, the two men came to his/her door and knocked on the door. When the witness answered, one of the two men told the witness that the witness needs to keep his/her mouth shut about the fire because "Bobby" was not going down for it. The witness said his/her neighbor also observed the men taking pictures of the witness' house with their phones.

## V.     CONCLUSION

81.     The above facts set forth probable cause to believe that **SALAZAR** violated 18 U.S.C. § 844(i), Arson of Commercial Property, and 18 U.S.C. § 844(h)(1), Arson in Furtherance of a Federal Felony. I request that an arrest warrant be issued for SALAZAR and CO-CONSPIRATOR 1 for these violations.

_____

Kristin E. Loeffler
Special Agent, Bureau of Alcohol, Tobacco,
Firearms and Explosives, U.S. Department of
Justice

COMPLAINT AFFIDAVIT                    21

Affidavit submitted by email/PDF and attested to me as true and accurate by telephone consistent with

Fed. R. Crim. P. 4.1 and 41(d)(3) on _____8/23/25_____.


_____
HONORABLE BARBARA A. MCAULIFFE
UNITED STATES MAGISTRATE JUDGE


                              RE:  ROBERT SALAZAR

Reviewed as to form by:

/s/ Robert L. Veneman-Hughes
ROBERT L. VENEMAN-HUGHES
Assistant U.S. Attorney